IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STACY LEWIS,<br>    *Plaintiff,*<br><br>v.<br><br>MARYLAND SHERIFF'S YOUTH RANCH,<br>    *Defendant.* | Civil Action No.: ELH-11-02494 |

**MEMORANDUM OPINION**

Plaintiff Stacy Lewis, who is self-represented, has sued her former employer, Maryland Sheriff's Youth Ranch ("MSYR"), defendant, alleging employment discrimination on the basis of disability in violation of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. §§ 12101, *et seq*. *See* Complaint (ECF 1) at 1-2. Plaintiff, who has diabetes, asked MSYR to permit her to work a "set shift" instead of a "swing shift," which would make it easier to manage her diabetes "because of eating habits, stress, and sleep habits." *Id.* at 2-3. She claims that she was forced to resign because MSYR refused to grant the requested accommodation, and seeks back pay and monetary damages in the amount of $250,000. *Id.* at 2-4.

MSYR has moved for summary judgment ("Motion," ECF 32), supported by a memorandum ("Memo," ECF 32-1). Plaintiff opposes the Motion ("Opposition," ECF 42), and defendant has replied ("Reply," ECF 48). Both parties have submitted numerous exhibits. As the matter has been fully briefed, the Court now rules pursuant to Local Rule 105.6, no hearing being necessary.

**Factual Background[1]**

MSYR is a group home for troubled youth. *See* defendant's Exh. 2, Affidavit of Mark Grover, MSYR Executive Director, ¶ 2. Plaintiff began work as a residential counselor at MSYR on January 14, 2007. *Id.* ¶ 3. She testified that, when she interviewed for the position, she understood that she would work "the overnight shift." *See* defendant's Exh. 1, Deposition of Stacy Lewis, Feb. 9, 2012, 71:17-20. It was her responsibility to be at MSYR when the residents were sleeping, and to get them up "early enough in the morning to get them ready for school." *Id.* at 72:1-2. However, she also acknowledged that her interviewers, Antoine Fisher and Robert Turner, did not assure her that she would be assigned exclusively to the overnight shift. *Id.* at 72:6-8. At the time of hire, plaintiff did not indicate that she could only work the overnight shift, nor did she disclose that she had diabetes. *Id.* at 72:3-11.

At the time she began working for MSYR, plaintiff received and read the job description for her new position. *See id.* at 88:20-89:12; *see also* defendant's Exh. 3, Residential Counselor Job Description. It states that employees must "[s]upervise youth in daily activities—be where youth are," and "[a]ccompany youth to activities planned for group." *See* defendant's Exh. 3. At the time plaintiff was hired, she did not indicate that she was unable to perform any of the functions listed in the job description. *See* Lewis Dep., 90:4-8.

Plaintiff also received and read the MSYR Personnel Manual. *See* Lewis Dep., 91:5-12; *see also* defendant's Exh. 4, Excerpt from MSYR Personnel Manual. It states that "employees are expected to work such hours as directed by their supervisor in accordance with their employment classification and the needs of the Ranch." Defendant's Exh. 4 at 11.

---

[1] The Court must construe the facts alleged in the light most favorable to plaintiff as the non-moving party. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *accord Scott v. Harris*, 550 U.S. 372, 380 (2007). Because plaintiff is proceeding without counsel, her filings have been "'liberally construed'" and are "'held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citation omitted).

On April 24, 2007, plaintiff was injured by a MSYR resident while working the overnight shift. *See* defendant's Exh. 9, May 10, 2007 Report of Injury. On the incident report, on the line next to "Recommendation on how to prevent this accident from recurring," plaintiff wrote: "Have enough staff to resident ratio so one person isn't left alone to long [sic] with the resident's [sic] by themselves." *Id.*[2]

In late October 2008, a MSYR resident, "Scorpio," began to harass plaintiff.[3] *See* Lewis Dep., 166:18-167:7. On November 5, 2008, plaintiff reported the harassment to Fisher and to Greta Mattis, a social worker at MSYR. *Id.* at 153:20-154:2; 158:3-10. Mattis told plaintiff to write a statement about the harassment and give it to Grace Roberts,[4] Fisher, Turner, and Grover. *Id.* at 154:14-17. That same day, Mattis wrote to Grover to tell him about the conversation she and Lewis had about the harassment. *See* defendant's Exh. 5, Nov. 5, 2008 Email From Mattis. Mattis told Grover that she had consulted Turner, and described some of the incidents of harassment Lewis had told her about. *Id*. Turner was copied on the email. *Id*.

Acting on Mattis's suggestion, plaintiff prepared a handwritten memorandum, dated November 6, 2008, to Grover, Turner, Fisher, and Roberts, in which she described the harassment. *See* defendant's Exh. 6, Nov. 6, 2008 Memorandum From Lewis. In the memorandum, plaintiff stated that Scorpio made "sexual comments and gestures" towards her, and one night "he came out of his room in nothing but his boxer's [sic]." *Id*. He asked plaintiff "if [she] wanted to join him [in the shower] so [they] could wash each others [sic] backs…." *Id*. He came into her office in a towel "asking for soap." *Id*. When she would wake him to take his

---

[2] In her Opposition, plaintiff avers that, at the time of the April 24, 2007 incident, "there was already another employee at work when [she] was injured," but that the other employee had taken the residents to the bus stop. *Id.* at 3. In its Reply, defendant contends that plaintiff "offers no admissible evidence to support [this] assertion…." *Id.* at 5.

[3] Scorpio's surname does not appear in the record.

[4] Ms. Roberts was one of Lewis's supervisors at MSYR. *See* defendant's Exh. 9.

medication, "he would roll over and try to pull [her] in bed with him." *Id*. And, on one occasion when she told him to pull up the back of his pants, he "pulled them up and pulled them back down and shook his rear-end at [her]." *Id*.

Plaintiff delivered a copy of the memorandum to Grover. *See* Lewis Dep., 173:16-174:7. Although the memorandum was also addressed to Turner, Fisher, and Roberts, she did not deliver it to them because she "didn't have a copy machine." *Id*. at 174: 8-14. She received no response to the memorandum. *Id*. at 174:15-19. But, at some point in December, Fisher spoke with Scorpio, whose behavior improved for the period leading up to his departure from MSYR for the Christmas holiday. *See id.* at 179:18-180:21.

When Scorpio returned to MSYR after the holiday, he again began to harass plaintiff. *See id.* at 187:2-5. Plaintiff complained about the harassment during a January 2009 staff meeting. *Id*. at 174:20-175:5; 179:5-20. She was instructed by her supervisors to document all incidents and draft a "safety plan." *See id.* at 257:4-8. *See also* defendant's Exh. 7, Safety Plan. In the safety plan that plaintiff ultimately drafted, dated February 4, 2009, she stated that she would shut and lock the office door, especially when she was alone; that she would permit only one resident in the office at a time when she was giving out medication; that she would let another employee know if Scorpio awoke in the night and it "gets out of hand"; that she would let another employee give Scorpio his medication so she would not be alone with him at any time; and that she would document all incidents with Scorpio. *Id*.

Plaintiff followed through on some aspects of the safety plan, but was not able, on at least one occasion, to follow the directive to refrain from giving Scorpio his medication so that she would not be alone with him. Plaintiff testified that one morning she was the only employee

available who was "med certified" to dispense medication, and dispensed Scorpio's medication out of necessity. Lewis Dep., 261:4-262:21.

During the overnight shifts, plaintiff was the only resident counselor on duty full time in the residential house in which she worked. *Id.* at 260:21-261:2. She testified that MSYR employees had been trained to handle "situations" in pairs, but she was not trained in how to respond to threats "if [she] was the only person around." *Id.* at 268:18-270:1.

Plaintiff informed Mattis that if Scorpio attempted to assault her during an overnight shift, "it wouldn't be her fault if he couldn't have kids in the future." *See id.* at 268:6-9. She explained that she "would defend herself [in that manner] against a man trying to rape her" in the middle of the night when no one else was around. *Id.* at 268:11-17. Mattis reported this statement to Grover by way of an email dated February 5, 2009. *See* defendant's Exh. 8, Mattis Memo to Grover (reporting that Lewis said "she will defend herself against Scorpio. She did not hint that it would be the way we learned in training. She said 'it would not be her fault if Scorpio was not able to have a family in the future' She was going to defend herself another way."). Grover forwarded the email to Turner that same day. *Id.*

In January 2009, the same month as the staff meeting at which Lewis complained of Scorpio's harassment, Lewis received her annual performance review. *See* defendant's Exh. 10, Jan. 28, 2009 Performance Review. She was rated "Below Satisfactory" in the following categories: "Maintains effective working relationships with co-workers"; "Works effectively as a team, maintaining positive attitude and refraining from negative comments / gossip"; "Follows proper discipline procedures"; "Consistently demonstrates initiative and good judgment,"; and "Documentation." *Id.* Plaintiff signed the evaluation on February 3, 2009. *Id.* Plaintiff testified

that, at that time, she did not disagree with any of her below satisfactory ratings. *See* Lewis Dep., 251:16-252:2.

At a second staff meeting held on February 9, 2009, it was discussed that, for reasons of safety, it would be preferable for plaintiff to work when there were other staff members present. *Id.* at 271:13-272:21. Turner proposed plaintiff's reassignment to the 4:00 p.m. to midnight shift. *Id.* at 250:1-7; *see also* defendant's Exh. 11, Minutes of February 9, 2009 Meeting.[5] According ot the Minutes of the meeting held on February 9, 2009, which Lewis signed, she "commented that a change in shift would not work with her son," because of her parental obligations to care for him. Defendant's Exh. 11, Minutes of February 9, 2009 Meeting; *see* Lewis Dep., 250:6-9; 274:2-9. Therefore, plaintiff refused to accept the new shift assignment. *See* Lewis Dep., 250:6-9; 274:2-9. Turner "responded that he had to do what was best for the Ranch and for her." Defendant's Exhibit 11, Minutes of February 9, 2009 Meeting.

Notably, at the February 9, 2009 meeting, Lewis did not mention her diabetes. Turner told Lewis she could work a 2:00 p.m. to 10:00 p.m. shift,[6] and that her continued employment at MSYR depended on her acceptance of a transfer to a different shift. Plaintiff was also advised that MSYR would prepare an "action plan" to help plaintiff improve in the "below satisfactory" areas on her performance review. *See* Lewis Dep., 273:11-274:1; defendant's Exh. 11, Minutes of February 9, 2009 Meeting. Turner gave plaintiff the action plan that day. *See* defendant's Exh. 12, Feb. 9, 2009 Action Plan.

After the meeting, Turner sent a memorandum to plaintiff, confirming her shift change. *See* defendant's Exh. 13, Feb. 9, 2009 Shift Change Memorandum. In that memorandum, Turner

---

[5] A handwritten annotation appears on the minutes that reads, "as typed by Linda C from her notes."

[6] There is no explanation in the record as to why the proposed shift initially was 4:00 p.m. to midnight, and then 2:00 p.m. to 10:00 p.m.

explained that the schedule change was intended to "ensure that [Lewis has] staff support and [is] not alone with residents for extended periods of time," as "MSYR takes each employees [sic] safety seriously…." *Id.*  Plaintiff refused to sign the memorandum. *See* Lewis Dep., 279:2-9. At her deposition, plaintiff stated that she "wasn't going to work those hours." *Id.* at 279:8-12. She also testified that she would not accept the 2:00 p.m. to 10:00 p.m. shift because of her diabetes, but admitted that, at the time she was offered the shift change, she did not mention her diabetes to Turner as a concern. *Id*. at 280:9-282:4.  Instead, she informed Turner only of her child care problem.  Lewis also testified that the 2:00 p.m. to 10:00 p.m. shift posed the same child care problems as the proposed 4:00 p.m. to midnight shift. *Id*. at 280:20-281:19.  Plaintiff acknowledged that, in the twenty-four years that she has had diabetes, she "never had any problems managing [her] diabetes." *Id*. at 303:12-13; 304:12-13.

On February 11, 2009, plaintiff filed a grievance with Fisher[7] regarding Turner's decision to reassign her to the 2:00 p.m. to 10:00 p.m. shift. *Id.* at 285:1-10.  For the first time, she raised her diabetes as a reason for refusing the shift change, stating that the day shift was problematic because she "cannot be out in the sun more than 15 minutes during the summer because it causes hypoglycemic reactions." *Id.*  At her deposition, she also explained that on the overnight shift she "could protect [herself] from the residents and eat when [she] needed to and check [her] blood sugar when [she] needed to." *Id*. at 300:12-15.

Fisher denied the grievance on February 19, 2009. *See* defendant's Exh. 14, Feb. 19, 2009 Fisher Memorandum.  He stated that "the change in shift is in the best interest of both parties," presumably referring to plaintiff and either Scorpio or MSYR. *Id.*  Fisher also commented that, with respect to the "medical issues" raised in the grievance, "having support on

---

[7] A copy of this grievance does not appear in the record.

another shift would be helpful to [plaintiff]," as she would be "more able to focus on [her] health issues" because she would not have to "worry about covering [her] shift…." *Id.*

Plaintiff appealed the decision to Turner. He denied the appeal on February 24, 2009. *See* defendant's Exh. 15, Feb. 24, 2009 Turner Memorandum. Turner wrote that he stood by his decision assigning plaintiff "to the 1400-2200 shift Monday-Friday." *Id.* In his view, the schedule change would "ensure that [plaintiff was] not alone when working with the residents of the MSYR." *Id.* He also told plaintiff that she would be reassigned to a different residential house, which would limit her interaction with Scorpio. *Id.* And, Turner asserted: "The safety and well being of all staff and residents is our priority." *Id.*

Turner also responded to plaintiff's concerns about her medical condition. He wrote: "The MSYR will make reasonable accommodations to address your medical condition. Placing you on a shift with other counselors will ensure that should a medical emergency occur you will have support staff to assist you." *Id.*[8] Turner warned plaintiff that she could only continue to work at MSYR if she accepted the schedule change and that, if she declined to do so, her employment would be terminated as of March 9, 2009. *Id.*

After receiving the denial letter, plaintiff did not request any accommodations, other than remaining on the midnight to 8:00 a.m. shift. *See* Lewis Dep., 300:1-18 ("Q. [W]hat was the reasonable accommodation that you requested? A. Just to stay on the same shift I was on…."). Instead, she appealed to Grover. *See id.* at 307:11-308:5. The written appeal was submitted in

---

[8] Plaintiff conceded at her deposition that, if she had a hypoglycemic reaction during the night shift, there would be no one to help her, but that if she had such a reaction during the day shift, there would be personnel available to provide assistance. *See* Lewis Dep., 301:6-13. However, plaintiff testified that she does not require anyone's assistance, so "it doesn't matter if [she's] by herself or if [she's] with more people." *Id.* at 303:7-12.

two parts, appended to the Opposition as plaintiff's Exhibits 5 and 6.  Plaintiff's Exhibit 5 is not dated, but Exhibit 6 is dated February 25, 2009, the day after Turner denied plaintiff's appeal.

In the grievance, plaintiff explained, plaintiff's Exh. 5:

> Due to medical conditions as well as personal conditions, the 12 AM-8 AM shift fits my schedule most appropriately.  I am a diabetic and on the insulin pump, and I feel that the other shifts offered, namely the 2 PM-10 PM shift, my health would be at jeopardy [sic].  As a diabetic, my blood sugar needs to be monitored constantly.  Also, since I have an insulin pump, there are many accessories that I would need to have with me in order to change my insulin set: insulin, reservoirs, needles, and the insulin set itself.  With my current 12 AM-8 AM shift, I am at the cottage the whole shift and have a locker to protect these accessories as well as a refrigerator to keep my insulin cold.  On the 2 PM-10 PM, there will be times where I would accompany the residents on outings, and provisions would need to be made to store my insulin in a container that would maintain it at a cold temperature, and I would need to carry all other accessories along, thus allowing unwanted exposure to the residents.  The insulin pump monitors my blood sugar level well, but there are times when this level goes extremely low.  In this case I need to use a glycogen needle to bring my blood sugar level to an appropriate level.  The presence of needles presents an additional risk to the ranch should one be seized by a resident.  The 12 AM-8 AM presents the best opportunity to protect these accessories from getting into the wrong hands.
>
> The 2 PM-10 PM shift also presents certain risks to my health, especially during the summer months when temperatures are high.  The heat from these temperatures has an adverse affect on the blood sugar levels of a diabetic, especially on a Type 1 diabetic as opposed to a Type 2 diabetic.  Exposed to a prolonged period in the heat, the blood sugar levels of a Type 1 diabetic tend to bottom out, or to dip extremely low in a short amount of time, as I have experienced a few times in my own life.  Responsibilities of a counselor on the 2 PM-10 PM shift would require many outside activities with residents in the heat.  I do not feel I would be best able to perform my job responsibilities fully under these conditions.

Plaintiff maintained that the ranch could not make any possible accommodations with respect to her medical condition that would enable her to perform the 2:00 p.m. to 10:00 p.m. shift.  *See* plaintiff's Exh. 6 ("I feel that the ranch cannot make any possible accomodations on [the 2:00 p.m. to 10:00 p.m.] shift.").  But, she suggested that MSYR move Scorpio to a different part of the Ranch, writing: "I feel that it is unfair for me to sacrifice my life for the inappropriate

actions by a resident at the ranch. I have been the victim in this situation but have been dealt with as if this was my fault." *Id*.

On March 9, 2009, Grover scheduled a meeting with plaintiff, Turner, and Fisher to discuss the grievance. *See* Lewis Dep., at 309:2-7. *See also* defendant's Exh. 16, Mar. 9, 2009 Meeting Notes.[9] At the meeting, plaintiff reiterated her concerns about her son's schedule, and expressed concerns about being in the sun on the day shift, and about the security of her medical equipment at MSYR. *See* defendant's Exh. 16. Grover again stated that MSYR would offer her reasonable accommodations,[10] but plaintiff refused. *Id.* At her deposition, she testified that she did not "ask Mr. Grover what accomodations he could make" because she "had no intentions of working that shift." Lewis Dep., 315:15-316:5. Thereafter, plaintiff resigned, effective March 9, 2009. *See* defendant's Exh. 16, Mar. 9, 2009 Meeting Notes.

In May 2009, plaintiff filed a discrimination claim with the Equal Employment Opportunity Commission ("EEOC"). In response to plaintiff's charge, MSYR submitted a position statement to the EEOC. *See* defendant's Exh. 17, MSYR Position Statement. MSYR posited that accommodations it could have offered plaintiff to enable her to work the day shift were access to "a safe for her medical supplies, assign[ment] to duties that severely limited her outdoor activities,…access to a secured medical refrigerator, and…ample time to monitor her blood sugar." *Id.* at 1. MSYR explained that it "rarely [has] all of [its] residents outside at any given time," and "routinely [has] at least one staff indoors with the children," and asserted that "Ms. Lewis would be assigned to this position." *Id*. at 6. MSYR claimed that it "is still open to making these accommodations for Ms. Lewis if she desires to accept the shift change." *Id*. at 1.

---

[9] A typewritten annotation on the minutes of the March 9, 2009 meeting reads: "Notes taken by Linda Clark." The minutes are not signed.

[10] It does not appear that Grover particularized the accommodations.

Plaintiff received a right to sue letter on June 18, 2011, a copy of which is appended to the Complaint.

In connection with this Motion, and in support of her assertion that it was medically necessary for her to remain on the overnight shift, as no accommodation would have enabled her to work the day shift, plaintiff has submitted, as plaintiff's Exh. 10, a letter from her physician, Dr. Nanette Steinle, dated November 14, 2011.  Dr. Steinle recommended the following:

> I recommend that you continue to maintain a routine schedule, to monitor your blood sugar at least before each meal and before sleep daily.  Is is [sic] important that you maintain a consistent working schedule as swing shifts tend to disrupt meal time schedules making it more difficult to manage your diabetes.  It is important to keep your testing supplies readily available so that you can test your glucose at any time you suspect hyper or hypoglycemia.

Defendant contends that the Steinle letter "is inadmissible, as it has not been authenticated, nor was it produced in discovery by Ms. Lewis or Dr. Steinle."  Reply at 7.  Defense counsel appended his affidavit as defendant's Exh. 18, attesting to this assertion.[11]

### Standard of Review

As noted, defendant has moved for summary judgment pursuant to Fed. R. Civ. P. 56. Under Rule 56(a), summary judgment is properly granted only if the movant shows "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of

---

[11] Discovery in this case was greatly complicated by plaintiff's repeated refusals to provide medical information or consent to the release of her medical records, resulting in the filing by defendant of a motion to compel (ECF 16), which was granted by Magistrate Judge Gauvey (ECF 24).  Thereafter, defendant filed a motion for sanctions (ECF 26), which Judge Gauvey also granted (ECF 34), eventually requiring plaintiff to pay attorney's fees related to the motions to compel and for sanctions (ECF 39).  Judge Gauvey stated, *id.* at 3:

> Given the long and extensive attempts of the defendant to obtain medical records necessary to properly defend the case…the Court shall impose attorney's fees. Plaintiff seems unwilling to comply with the Court's orders, even when given second chances and has unnecessarily complicated defendant's investigation and defense of this case.  While it may appear hyper-technical or indeed punitive to impose attorney's fees…this was the last failure of several on the part of the plaintiff.

law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing former Fed. R. Civ. P. 56(c)). In resolving the motion, the Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott, supra*, 550 U.S. at 378. However, the non-moving party must demonstrate that there are disputes of material fact so as to preclude the entry of judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

To meet this burden, the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id.*; *see In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). Stated another way, "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts'" showing that there is a genuine dispute of material facts. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex Corp.*, 477 U.S. at 322-24. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. If "the evidence is such that a reasonable jury could return a verdict" for the non-moving party, there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

**Discussion**

The ADA prohibits discrimination against a "qualified individual with a disability" with respect to the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "One

form of discrimination prohibited by the ADA is a failure to make a reasonable accommodation." *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 322 (4th Cir. 2011). In order to establish a prima facie case of discrimination, a disability discrimination plaintiff bringing a "failure to accommodate" claim must establish the following elements:

> (1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position...; and (4) that the [employer] refused to make such accommodations.

*Rhoads v. FDIC.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001), *cert. denied*, 535 U.S. 933 (2002).

The plaintiff bears the "burden of identifying an accommodation that would allow a qualified individual to perform the job rests with the plaintiff, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." *Lamb v. Qualex, Inc.*, 33 F. App'x 49, 59 (4th Cir. 2002). "Once the plaintiff has met his burden of proving that reasonable accommodations exist, the employer may present evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer." *Id.* Notably, "'[a]n employer is not obligated to provide an employee the accommodation he or she requests or prefers; the employer need only provide some reasonable accommodation.'" *Crawford v. Union Carbide Corp.*, No. 98-2448, 1999 WL 1142346, *4 (4th Cir. Dec. 14, 1999) (citation omitted), *cert. denied*, 530 U.S. 1234 (2000).

Here, the parties do not dispute that Lewis is an individual with a disability within the meaning of the ADA, or that MSYR had notice of her disability. Nor is it disputed that, with reasonable accommodation, Lewis could perform the essential functions of her position as a counselor at MSYR. The issue is whether Lewis was denied a reasonable accommodation.[12]

---

[12] Defendant observes: "While Plaintiff's Complaint appears to assert a claim only for failure to make a reasonable accommodation, it is possible that she may claim she suffered an

Under the statute, a "reasonable accommodation" may include the following:

> [J]ob restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C.A. § 12111(9)(B).

The applicable federal regulations provide, in part: "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). The so called "interactive process" should "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id*. *See also Haneke v. Mid–Atl. Capital Mgmt.,* 131 F. App'x 399, 399–400 (4th Cir. 2005) ("Implicit in the fourth element [of the prima facie case] is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation").

MSYR insists that plaintiff cannot prove that she was denied a reasonable accommodation. Memo at 8. It maintains that plaintiff "did not request any accommodation to perform the essential functions of her position on the new shift, although MSYR was willing to make accomodations." *Id*. at 9. According to defendant, plaintiff wanted to continue on her initial overnight schedule not because of her diabetes, but because of "her concerns about caring for her son," and thus "the request was not one for a reasonable accommodation of her

---

adverse employment action…." Memo at 14. It then dedicates a page of its briefing to arguing that plaintiff cannot establish that she suffered an adverse employment action. *Id*. at 14. In my view, plaintiff has brought only a failure-to-accommodate claim. Therefore, I need not address the matter of adverse determination.

disability….” *Id.* at 11. In MSRY's view, Lewis "simply did not want to work on the 2:00 p.m. to 10:00 p.m. shift, with or without accommodation." *Id.*

MSYR contends: "A request to remain on a certain shift in violation of an employer's well established policy is not a reasonable accommodation." *Id.* at 9 (citing *EEOC v. Sara Lee Corp.,* 237 F.3d 349 (4th Cir. 2001)); *see* Memo at 11 (citing *Goodman v. Potter*, 412 F. Supp. 2d 11 (D.D.C. 2005), *aff'd*, No. 06-5071, 2006 WL 4449339 (D.C. Cir. Nov. 14, 2006)). Defendant points to its "well established polic[ies]" that employees work "hours as directed by their supervisor in accordance with…the needs of [MSYR]," and "follow rules of conduct that will protect the interests and safety of all youth, employees, and [MSYR]." Memo at 10 (quoting Defendant's Exh. 4, Excerpt from MSYR Personnel Manual, at 11; 18). It observes that it is "undisputed that the reason given for Ms. Lewis' reassignment…was to ensure her safety and that of the MSYR residents, in accordance with these established policies of MSYR." Memo at 10.

Further, MSYR argues that even if, *arguendo*, plaintiff's "refusal to accept the reassignment can be construed as a request for reasonable accommodation, the undisputed facts establish that Plaintiff refused to engage in the interactive process, despite MSYR's willingness to do so." *Id.* at 13. It observes that Lewis "declined to identify a single reasonable accommodation or to ask MSYR what accomodations it could make to allow her to work on the new shift." *Id.*

In her Complaint, plaintiff claims MSYR refused to make reasonable accomodations, in that it refused to permit her to continue working as a residential counselor at MSYR on the overnight shift. Complaint at 2; *see also* Lewis Dep., 300:1-18 ("Q. [W]hat was the reasonable accommodation that you requested?  A. Just to stay on the same shift I was on…."); plaintiff's

Exh. 6, Feb. 25, 2009 Appeal to Grover ("I feel that the ranch cannot make any possible accomodations on [the 2:00 p.m. to 10:00 p.m.] shift.").

In her Opposition, plaintiff argues that she was not required to disclose that she had diabetes at the time she applied to work for MSYR. Opposition at 1. She concedes that she read the job description for her position, but asserts that "most of the duties and responsibilities [in the job description] can not be applied to the midnight shift because the residents are asleep…." *Id*. She highlights her previous flexibility with respect to work hours, noting that she occasionally "worked overtime in the morning when the day shift didn't show up on time," and emphasizes that her failure to fully comply with the safety plan was prompted by necessity. *Id*. at 2. And, plaintiff insists that her request to stay on the overnight shift was motivated by concerns about her diabetes, asserting that defendant "assumed again that [the request] was because of [her] son" because she had previously stated she could not work a day shift because of her son. *Id*. at 4.

In my view, no reasonable jury could find that MSYR refused to make reasonable accomodations for plaintiff to permit her to perform the essential functions of her position. *Crabill*, 423 F. App'x at 322. Plaintiff cannot claim that she did not know her hours were subject to change, or that MSYR lacked the right to change the hours of its employees for a lawful purpose. As noted, when plaintiff was hired as an MSYR residential counselor, she was assigned to the midnight to 8:00 a.m. shift. However, that was not a permanent assignment; plaintiff was not guaranteed that she would always be assigned to work those hours. *See* Lewis Dep., 72:6-8. Indeed, she received and read the MSYR Personnel Manual, *id.* at 91:5-12, which indicated that, as a residential counselor, she would be "expected to work such hours as directed by their supervisor in accordance with their employment classification and the needs of the Ranch." Defendant's Exh. 4 at 11. Moreover, it is undisputed that MSYR wanted to remove

plaintiff from the overnight shift because of concerns about her safety and the safety of MSYR residents, and not because of an invidious discriminatory purpose.

It is true, as plaintiff argues, that "most of the duties and responsibilities [in the job description] can not be applied to the midnight shift because the residents are asleep…." Opposition at 1. But, plaintiff was hired as a residential counselor, not an overnight residential counselor. Plaintiff received and read the job description for the position of residential counselor, Lewis Dep., 88:20-89:12, which indicated that residential counselors are expected to join outings with residents and "be where youth are." Defendant's Exh. 3. Plaintiff did not indicate that she was unable to perform any of the duties required of a residential counselor. Lewis Dep., 90:4-8.

In support of plaintiff's assertion that, due to her diabetes, she could only work the overnight shift, she asserts the following: that she could not be out in the sun, Lewis Dep., 285:1-10; that on the overnight shift she could "eat when [she] needed to and check [her] blood sugar when [she] needed to," *id*. at 300:12-15; that if asked to accompany the residents on outings during the day shift, "provisions would need to be made to store [her] insulin in a container that would maintain it at a cold temperature" and she would need to carry "accessories" with her, including needles, which could pose a risk "should one be seized by a resident," defendant's Exh. 5, Appeal to Grover; and that she was concerned about the security of her medical equipment at MSYR. *See* defendant's Exh. 16., Mar. 9, 2009 Meeting Notes.

There is no basis to conclude that these matters could not have been accomodated during the day shift. Turner and Grover stated repeatedly that MSYR was able and willing to offer accomodations that would address the problems plaintiff identified in connection with her diabetes and the day shift. For example, as discussed, it would have assigned her to tasks that

would have permitted her to be the staff person who remained indoors during the heat of the day; it would have offered her "ample time" to monitor her blood sugar; and it was willing to provide a safe and secure refrigerator in which to store supplies, to assuage her concerns about the security of her medical equipment at MSYR.  *See* defendant's Exh. 17, MSYR Position Statement.

Moreover, plaintiff admitted that she simply "had no intentions of working that shift." Lewis Dep., 315:15-316:5; *see also* defendant's Exh. 16, Mar. 9, 2009 Meeting Notes ("Stacy stated that the shift change would not accommodate her at all, due to the fact that she was diabetic and also the schedule for her son.  She said that her son will always come first over any job.").  Moreover, she refused to discuss the accomodations MSYR could make to enable her to work the earlier shift while also managing her diabetes effectively.  *See* Lewis Dep., 315:15-316:5; defendant's Exh. 16, Mar. 9, 2009 Meeting Notes.  Instead, she resigned.

"[N]either party should be able to cause a breakdown in the [interactive] process for the purpose of either avoiding or inflicting liability.  Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).  "A party that obstructs or delays the interactive process is not acting in good faith.  A party that fails to communicate, by way of initiation or response, may also be acting in bad faith." *Id.* (affirming summary judgment for defendant because, due to employee's failure to communicate, "the interactive process broke down.").  "Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown." *Id.* at 1137.  *Accord Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998) (affirming summary judgment for the defendant

because, "as in *Beck,* the employee's failure to provide medical information necessary to the interactive process precludes her from claiming that the employer violated the ADA by failing to provide reasonable accommodation.").

Here, despite defendant's attempts to engage plaintiff in the interactive process, she refused to discuss possible accommodations. Accordingly, defendant "cannot be held liable for failing to provide a reasonable accommodation." *Villone v. United Parcel Servs., Inc.*, No. 09–8213, 2011 WL 4402954, *8 (D. Ariz. Sept. 22, 2011). *See also Allen v. Pacific Bell*, 348 F.3d 1113, 1116 (9th Cir. 2003) (affirming summary judgment for defendant because plaintiff failed to cooperate in the interactive process); *Turner v. City and Cnty. of Denver*, No. 10–00583, 2011 WL 1595981, *3 (D. Colo. Apr. 27, 2011) (granting summary judgment to defendant because plaintiff refused to participate in "interactive process meeting" and failed to provide "any medical documentation of his condition or any information about his restrictions.").

In her final appeal to Grover, plaintiff's Exh. 6, plaintiff wrote: "If my shift can not stay the same I will not take the other shift due to my health conditions and due to the fact that my son needs his mother." By her own admission, plaintiff was disinterested in any accommodations MSYR could offer, at least partly for personal, not medical, reasons. She refused to engage in the interactive process, preferring to resign. As noted, "'[a]n employer is not obligated to provide an employee the accommodation he or she requests or prefers; the employer need only provide some reasonable accommodation.'" *Crawford,* 1999 WL 1142346 at *4 (citation omitted).

The Steinle letter is the only evidence plaintiff has offered in support of her assertion that, due to her disability, she could not work the 2:00 p.m. to 10:00 p.m. shift, with or without accomodations. *See* plaintiff's Exh. 10. Even assuming, *arguendo*, that the Steinle letter is

admissible, Dr. Steinle merely averred that plaintiff should "maintain a routine schedule" and "maintain a consistent working schedule." *Id*. To be sure, Dr. Steinle noted that "swing shifts tend to disrupt meal time schedules." *Id*. But, it is undisputed that plaintiff was offered a set daily schedule. And, Dr. Steinle did not say that, if plaintiff worked the 2:00 p.m. to 10:00 p.m. shift, she could not safely manage her medical condition. Plaintiff has not put forward any evidence that she could not, with reasonable accommodation, arrange meals around the 2:00 p.m. to 10:00 p.m. shift, as she had managed to do with the overnight shift.

## Conclusion

In my view, plaintiff has woefully failed to demonstrate discrimination on the basis of disability. For the foregoing reasons, the Court will grant defendant's Motion (ECF 32). A separate Order, consistent with this Opinion, follows.

Date: July 20, 2012               /s/
                                  Ellen Lipton Hollander
                                  United States District Judge